Filed 5/29/13

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

|  |  |
|---|---|
| AREI II CASES. | A130447<br>(JCCP No. 4730)<br><br>(Los Angeles County<br>Super. Ct. No. BC403385) |

Plaintiffs are investors who purchased tenant in common (TIC) ownership interests in a senior housing facility from Asset & Real Estate Investment Company. (AREI). AREI allegedly violated state securities law by failing to disclose that its sole owner was a convicted felon and by concealing the existence of a second loan that grossly overleveraged the property. Plaintiffs sued various parties associated with the transaction, including the defendant investment bankers, who structured joint ventures between AREI and various lenders but had no involvement in the sales of TIC interests to plaintiffs. According to plaintiffs, the investment bankers knew that AREI did not disclose its owner's felony conviction or the second loan to potential investors. Plaintiffs alleged causes of action against the investment bankers for materially assisting in AREI's violation of securities law and for fraud based upon a conspiracy. On appeal, plaintiffs contend the trial court erred in sustaining the investment bankers' demurrer.

We conclude the operative second amended complaint (the complaint) does not state a cause of action against the investment bankers for materially assisting in a securities law violation under Corporations Code section 25504.1.[1] However, we also conclude the facts as pleaded are minimally sufficient to state a cause of action against

---

[1] All further statutory references are to the Corporations Code unless otherwise specified.

1

the investment bankers for common law fraud based upon a conspiracy to defraud the investors.

FACTUAL AND PROCEDURAL BACKGROUND

Because this appeal is from an order sustaining a demurrer, we take the facts from the complaint, the allegations of which are deemed true for the limited purpose of determining whether plaintiffs have stated a viable cause of action. (See *Stevenson v. Superior Court* (1997) 16 Cal.4th 880, 885.)

As set forth in the complaint, defendant James Koenig was the founder and sole owner of AREI, which promoted senior housing facilities to potential investors as secure and profitable investment opportunities.[2] AREI was in operation for about 10 years starting in the late 1990's. Koenig is a convicted felon who was sentenced in 1986 to serve two years in prison after suffering a conviction for fraud in a gold-selling scam. AREI was allegedly little more than a criminal operation that acquired senior housing facilities through Ponzi schemes and other forms of investor fraud. In June 2008, the California Attorney General raided AREI's offices and shut down its operations.

In 2004, AREI developed a structured transaction to acquire and manage senior housing facilities throughout the country. Ari Weinberger, vice-president of Shattuck Hammond Partners, a division of Morgan Keegan & Co., Inc. (collectively Morgan Keegan) assisted AREI in structuring the transaction. Morgan Keegan, which is a defendant below and the respondent in this appeal, is described as an investment bank. AREI's plan was to solicit lenders to invest in the senior housing facilities, which were to be managed by AREI's captive management company. A broker-dealer agreed to perform due diligence on AREI and to sell TIC interests in the properties to individual investors.

Morgan Keegan's role in the overall transaction was to structure joint ventures between AREI and various lenders, and it took primary responsibility for drafting an

---

[2] The complaint refers to the types of properties acquired by AREI as either assisted living facilities or senior housing facilities. We shall use the term senior housing facilities to encompass both types of facilities.

2

offering memorandum to prospective joint venture partners. In response to efforts to secure partners in the joint venture, defendants CapitalSource, Inc. and CapitalSource Finance, LLC (collectively CapSource) agreed to enter into a $50 million joint venture with AREI for the purchase and management of senior housing facilities. Morgan Keegan negotiated the terms of the joint venture, which called for the sale of TIC interests to investors, with the remaining financing to be provided by CapSource in the form of first mortgages secured by the properties.

A senior housing facility in Roseville, California (the Roseville property) was one of the properties AREI marketed to potential investors through various broker-dealers and their agents. In or around August 2005, AREI circulated a private placement memorandum (PPM) to potential investors seeking approximately $17.2 million for the purchase of TIC interests in the Roseville property. The PPM disclosed that the Roseville property would be subject to a first mortgage from CapSource of approximately $7 million. The purchase price of the Roseville property was $18.8 million. The PPM also disclosed that AREI could seek additional financing for the Roseville property, if necessary, with the unanimous approval of the TIC investors. The PPM failed to disclose that Koenig, the sole owner of both AREI and the proposed management company, is a convicted felon.

In reliance on the representations in the PPM, over 30 investors purchased TIC interests in the Roseville property and invested a total of over $17 million in cash in the venture. In order to effectuate the purchase, the investors formed limited liability companies and entered into operating agreements, a master TIC agreement, and a master lease agreement providing for the management and operation of the Roseville property. The limited liability companies that invested in the Roseville property are the plaintiffs in the action below.

In furtherance of the transaction described in the PPM, representatives of AREI signed a promissory note, a deed of trust, and various other lending agreements with CapSource allowing it to record its $7 million first mortgage against the Roseville property. As noted above, AREI disclosed this loan in the PPM. In addition, while

3

escrow on the transaction was still open, Koenig, CapSource, and lender Meecorp Capital Markets (Meecorp) entered into confidential negotiations to further leverage the nationwide joint venture with a $75 million "mezzanine" loan from Meecorp. These same parties also secretly agreed that Meecorp would provide an additional mezzanine loan of $5.1 million to help fund the acquisition of the Roseville property. Although the PPM specified that the investors in the Roseville property were required to unanimously approve any additional loans secured by the property, the Meecorp loan was not disclosed to plaintiffs and the loan documentation was executed without their authorization. In October 2005, Meecorp recorded a $5.1 million deed of trust against the Roseville property, purportedly without plaintiffs' authorization. Morgan Keegan assisted in the structuring of the joint venture with Meecorp and the $5.1 million mezzanine loan secured by the Roseville property.

Koenig allegedly embezzled the loan proceeds and investor capital for his own personal use or to fund other projects. Further, AREI's management companies mismanaged the Roseville property and skimmed over $1 million from a capital account provided by plaintiffs. The facility fell into disrepair, its licensure lapsed, vendors went unpaid, and regulatory complaints were issued for health and safety violations. After plaintiffs learned that the CapSource and Meecorp loans had fallen into default, they removed the management company and attempted to refinance the property with another lender to avoid losing their investments. Despite plaintiffs' efforts, Meecorp issued a notice of default on the $5.1 million mezzanine loan and pursued a nonjudicial foreclosure on the Roseville property.

Plaintiffs filed suit in Los Angeles County Superior Court against Koenig, AREI, CapSource, Meecorp, and numerous other individuals and entities associated with the sale of TIC interests in the Roseville property. Plaintiffs added Morgan Keegan as a defendant in a first amended complaint. The action was transferred to Marin County and coordinated for trial with other, similar complaints against AREI in Judicial Council Coordination Proceeding No. 4579, *Asset Real Estate and Investment Company and Advisors (AREI) Cases*). The trial court sustained Morgan Keegan's demurrer to the first

amended complaint with leave to amend, noting that plaintiffs offered to include further allegations supporting causes of action against Morgan Keegan.[3]

In the operative second amended complaint (which we refer to herein as the complaint), plaintiffs assert various causes of action against Koenig and AREI, including, as relevant here, the first cause of action for material misrepresentation or omission in a securities transaction and the ninth cause of action for common law fraud. Plaintiffs allege they were induced to purchase the TIC interests in the Roseville property based on misrepresentations contained in the PPM. According to plaintiffs, the PPM contained two major misrepresentations or omissions of material fact in that it failed to disclose Koenig's felony conviction and the existence of the $5.1 million Meecorp mezzanine loan. Plaintiffs assert secondary securities liability claims against lenders CapSource and Meecorp as well as the broker-dealers who marketed and sold the TIC interests to plaintiffs.

Plaintiffs assert two causes of action against Morgan Keegan—the third cause of action for joint and several liability of persons who materially assist in a securities violation, in violation of section 25504.1, and the tenth cause of action for fraud based upon a conspiracy. As support for their claims, plaintiffs allege that Morgan Keegan structured the debt financing for the joint ventures and gained detailed, insider knowledge about AREI's operations and Koenig's background, including knowledge of Koenig's felony conviction. It is further alleged that Morgan Keegan reviewed PPM's for several of AREI's senior housing facilities and thereby learned that a fraud was being committed upon potential investors due to the failure to disclose the fact Koenig is a convicted felon. Plaintiffs assert that Morgan Keegan took primary responsibility for preparing an offering memorandum directed to prospective joint venture partners that failed to disclose Koenig's criminal background. Plaintiffs allege that Morgan Keegan initially agreed with AREI to conceal Koenig's criminal conviction from potential joint venture partners,

---

[3] While this matter was on appeal, the action was transferred back to Los Angeles County and coordinated for trial there with other, related complaints in Judicial Council Coordination Proceeding No. 4730, *AREI II Cases.*

although plaintiffs acknowledged that CapSource learned of Koenig's felony conviction before funding the joint venture. Morgan Keegan purportedly knew the information contained in the offering memorandum would be used to complete several securities offerings and would provide the basis for a due diligence report. Further, Morgan Keegan allegedly acted as a "go-between" for background checks on Koenig and the potential viability of AREI's projects. Morgan Keegan assisted in the structuring of the Meecorp mezzanine loan and allegedly knew the loan was not disclosed to plaintiffs. Plaintiffs further allege that Morgan Keegan knew AREI intended to conceal Koenig's criminal background from the investing public, including plaintiffs. Morgan Keegan charged over $500,000 for its work structuring and closing the joint venture transactions.

Morgan Keegan demurred to the complaint, arguing the cause of action for violating section 25504.1 failed to state a claim because there were no allegations that Morgan Keegan had knowledge of the securities violation, intended to defraud plaintiffs, or took any action materially assisting in the violation. Regarding the cause of action for fraud, Morgan Keegan contended the complaint failed to plead knowledge of the fraud, the existence of an agreement to engage in a conspiracy to defraud, or that Morgan Keegan engaged in any illegal actions in furtherance of the conspiracy.

The trial court sustained Morgan Keegan's demurrer without leave to amend. In its order sustaining the demurrer, the trial court concluded the complaint did not state a cause of action for materially assisting in a securities violation, reasoning as follows: "The only acts [Morgan Keegan] is alleged to have committed are to arrange the original and mezzanine financing between the seller/owner AREI and the lenders, CapitalSource and Meecorp, respectively. Playing an instrumental role in these legitimate transactions between seller and lenders did not involve [Morgan Keegan] in *materially assisting* AREI **in the violation**, i.e., selling or offer[ing to sell] securities by means of untrue statements or omissions of material fact." In sustaining the demurrer to the cause of action for fraud and conspiracy, the court concluded that plaintiffs had failed to plead specific facts showing either an agreement to defraud plaintiffs or Morgan Keegan's knowledge of the

6

fraud. Following entry of a judgment of dismissal as to Morgan Keegan, plaintiffs filed a timely appeal.

## 1.     Standard of Review

On review of an order sustaining a demurrer without leave to amend, we exercise independent judgment in assessing whether the complaint states a cause of action as a matter of law. (*Walgreen Co. v. City and County of San Francisco* (2010) 185 Cal.App.4th 424, 433.) " ' "We treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law. [Citation.] We also consider matters which may be judicially noticed." ' " (*Zelig v. County of Los Angeles* (2002) 27 Cal.4th 1112, 1126.) "We affirm if any ground offered in support of the demurrer was well taken but find error if the plaintiff has stated a cause of action under any possible legal theory. [Citations.] We are not bound by the trial court's stated reasons, if any, supporting its ruling; we review the ruling, not its rationale." (*Mendoza v. Town of Ross* (2005) 128 Cal.App.4th 625, 631.) When a demurrer is sustained without leave to amend, we reverse if there is a reasonable possibility an amendment could cure the defect. (*City of Dinuba v. County of Tulare* (2007) 41 Cal.4th 859, 865.)

## 2.     Materially Assisting in a Securities Law Violation

Plaintiffs contend the trial court erred in sustaining the demurrer to the cause of action under section 25504.1 for materially assisting in a securities law violation. As we explain, because there are no allegations that Morgan Keegan materially assisted in the securities law violation itself, the complaint does not state a cause of action under section 25504.1.

### a.     *Statutory Framework*

Section 25504.1 is part of the Corporate Securities Law of 1968 (§ 25000 et seq.) (the Act). The Act includes several sections describing fraudulent or prohibited practices. (§§ 25400-25404.) Of particular importance to this dispute is section 25401 of the Act, which prohibits misrepresenting or omitting material facts in connection with the

7

purchase or sale of securities.[4]  Sections 25401 is considered "penal in nature" because a person who violates the statute may be imprisoned or fined.  (*California Amplifier, Inc. v. RLI Ins. Co.* (2001) 94 Cal.App.4th 102, 109.)

Section 25501 establishes civil liability for a violation of section 25401.  The liability created by section 25501 is sometimes referred to as primary or direct because it applies to a person who is directly or primarily responsible for violating section 25401 as a consequence of selling or buying securities by means of misrepresentations or omissions of material fact.  (See *Moss v. Kroner* (2011) 197 Cal.App.4th 860, 873.)

In addition to primary civil liability established in section 25501, the Legislature has extended civil liability for a violation of section 25401 to specified secondary actors who assist in the primary violation.  (*Moss v. Kroner, supra,* 197 Cal.App.4th at p. 873.)  Section 25504 extends secondary liability to certain agents, associates, and affiliates of the primary violator, including persons who control the primary violator as well as broker-dealers and employees of the primary violator who materially aid in the transaction constituting the violation.  (§ 25504.)  As relevant here, secondary liability is also created under section 25504.1, which provides in pertinent part that "[a]ny person who materially assists in any violation of Section . . . 25401 . . . with intent to deceive or defraud, is jointly and severally liable with any other person liable under this chapter for such violation."  Section 25504.1 imposes what is sometimes referred to as aider and abettor liability.  (See 1 Marsh & Volk, Practice Under the Cal. Securities Laws (rev. ed. 2012) § 14.03[4][d], p. 14-26 (Marsh & Volk).)

The purpose of the Act's civil liability provisions "is to create statutory liability that eliminates some of the elements of common law fraud, but balances this expansion of liability by placing other restrictions on recovery."  (*California Amplifier, Inc. v. RLI Ins. Co., supra,* 94 Cal.App.4th at p. 109.)  "While intending to minimize securities fraud,

---

[4]  Section 25401 provides:  "It is unlawful for any person to offer or sell a security in this state by means of any written or oral communication which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statement made, in the light of the circumstances under which they were made, not misleading."

the drafters of the Act were also cognizant of the dangers of casting the net of civil liability too broadly." (*Department of Corporations v. Superior Court* (2007) 153 Cal.App.4th 916, 929.) According to the principal drafters of the Act,[5] the Legislature chose to specify the elements of a statutory cause of action in detail and "decided to make it clear that the judiciary is not authorized to invent causes of action inconsistent with or additional to those provided in the statute." (Marsh & Volk, *supra,* § 14.02[1], p. 14-15.) Thus, in section 25510 the Legislature provided that, "Except as explicitly provided in this chapter, no civil liability in favor of any private party shall arise against any person by implication from or as a result of the violation of any provision of this law or any rule or order hereunder." "The purpose of this provision is to prevent the courts from using other provisions of the statute to create implied causes of action, as has happened in the federal courts in connection with the developments under Rule 10b-5 . . . ." (Marsh & Volk, *supra,* § 14.02[1], p. 14-15, fn. omitted.) However, the same section also clarifies that the Act does not limit any common law or statutory liability that would exist if the Act were not in effect. (§ 25510.)

**b.** ***Scope of Aiding and Abetting Liability***

Section 25504.1 makes a person jointly and severally liable for a violation of section 25401 if that person "materially assists in [the] violation of Section . . . 25401 . . . with the intent to deceive or defraud." In this case, the parties have divergent views on what constitutes material assistance in the violation. To determine the meaning of the "material assistance" component of section 25504.1, we turn to well settled rules of statutory construction.

---

[5] "Our Supreme Court has referred to former Commissioner Volk and Professor Marsh as the Act's 'principal drafters' and relied on their treatise interpreting the Act as authoritative." (*Department of Corporations v. Superior Court, supra,* 153 Cal.App.4th at p. 930, fn. 8; citing *Mirkin v. Wasserman* (1993) 5 Cal.4th 1082, 1103, fn. 10 [ [relying on Marsh & Volk treatise for interpretation of the Act and noting that "Professor Harold Marsh, Jr., was the reporter for the committee that drafted the California Corporate Securities Law of 1968" and that "Robert H. Volk was Commissioner of Corporations at that time"].)

Our fundamental task is to ascertain the Legislature's intent. " 'We begin with the plain language of the statute, affording the words of the provision their ordinary and usual meaning and viewing them in the statutory context, because the language employed in the Legislature's enactment generally is the most reliable indicator of legislative intent.' [Citations.] The plain meaning controls if there is no ambiguity in the statutory language." (*People v. Cornett* (2012) 53 Cal.4th 1261, 1265.) If the statute is susceptible to more than one interpretation, we may consider various extrinsic aids, such as the legislative history, public policy concerns, and the statutory scheme of which the statute is a part. (*Ibid.*) We construe the statute according to its purpose and by harmonizing it with related sections of the Act to the extent possible. (*California Amplifier, Inc. v. RLI Ins. Co., supra,* 94 Cal.App.4th at pp. 107-108.)

The plain language of section 25504.1 makes clear that a person must have materially assisted *in* the securities law violation. Therefore, for purposes of section 25504.1, it is not enough that a person provided material assistance in a larger scheme to defraud if that person had no role or involvement in the part of the scheme that constituted a violation of the securities laws. Here, the primary violation is selling or offering to sell a security by means of false and misleading statements, in violation of section 25401. To support liability under section 25504.1 for such a violation, the complaint must include allegations demonstrating how the defendant assisted in the act of selling or offering to sell securities by means of false and misleading statements. Such assistance may take the form of aiding in the preparation of offering documents relied upon by investors, communicating misrepresentations directly to investors, or otherwise playing a material, facilitating role in the act of selling or attempting to sell the securities by means of misrepresentations or omissions of material fact. There may be other acts that constitute material assistance under the statute, but they must involve some aspect of the securities law violation.

A review of the statutory scheme governing civil liability under the Act supports our interpretation of the material assistance component of section 25504.1. In section 25504, secondary liability is imposed upon broker-dealers and employees of the primary

10

violator who "materially aid in the act or transaction constituting the violation" if they have knowledge of, or reasonable grounds to know, of the facts giving rise to the statutory violation. In *Apollo Capital Fund LLC v. Roth Capital Partners, LLC* (2007) 158 Cal.App.4th 226 (*Apollo*), the Court of Appeal considered whether a complaint stated a cause of action under section 25504 against a broker-dealer. The court held that merely playing an active role in a securities offering was insufficient for purposes of the material aid requirement of section 25504. (*Apollo, supra,* at p. 256.) Instead, the broker-dealer must have materially aided *in the violation*, which in that case was the primary violator's sales of securities by means of false or misleading statements in the offering documents. (*Ibid.*) Plaintiffs seize on the court's statement in *Apollo* that it was unnecessary to allege the broker-dealer actually participated in drafting the false or misleading statements. It was unnecessary to include such an allegation because there were other allegations demonstrating the broker-dealer actively solicited investors using an offering document the broker-dealer knew contained false or misleading statements. (*Ibid.*) Thus, even though the broker-dealer did not draft the misleading statements, the allegations of the complaint were sufficient to state a claim the broker-dealer materially aided in the transaction constituting the violation.

Unlike section 25504, which requires some sort of control person, employee, or agency relationship with the primary violator, section 25504.1 imposes collateral liability upon persons who materially assist in a violation of section 25401 regardless of their business or legal relationship to the primary violator. (See Marsh & Volk, *supra,* § 14.03[4][d], p. 14-26.) While section 25504.1 expands the reach of secondary liability to persons not otherwise liable under section 25504, it also requires a greater showing to impose joint and several liability upon aiders and abettors. For example, section 25504.1 requires that an aider and abettor must have acted with "intent to deceive or defraud." By contrast, an employee or broker-dealer may be liable under section 25504 merely if they knew or had reason to know of the facts constituting the violation. Further, whereas section 25504 requires that a person "materially aid[] in the act or transaction constituting

11

the violation," section 25504.1 is arguably even more stringent because it requires material assistance in the actual violation.

The requirements for aider and abettor liability are understandably stricter than for control person or agent liability because of the potential to impose joint and several liability upon persons with a more attenuated relationship with the primary violator. When the statutory scheme is viewed as a whole, therefore, it cannot be the case that aider and abettor liability in section 25504.1 applies to a broader spectrum of aid or assistance than secondary liability applicable to control persons, employees, and agents in section 25504. As the court held in *Apollo,* section 25504 requires that a person materially aid not just in the transaction but in the violation itself. (*Apollo, supra,* 158 Cal.App.4th at p. 223.) Section 25504.1 requires no less.

Plaintiffs contend the "material assistance" requirement of section 25504.1 is satisfied if it is shown that, "absent defendant's acts, the violation would not have taken place." In essence, they argue that material assistance has been established if there would have been a securities law violation "but for" the defendant's role. Plaintiffs contend this standard is met here because AREI could not have pursued its scheme to violate securities laws but for Morgan Keegan's role in structuring the overall transaction and securing debt financing. We are not persuaded. A "but for" approach to assessing material assistance would potentially extend liability to persons who have no involvement whatsoever in the actual securities law violation. Because the approach advocated by plaintiffs is inconsistent with the plain language of section 25504.1, we reject it.

Plaintiffs also rely on federal case law, which is largely unhelpful. As an initial matter, in 1994 the United States Supreme Court held there is no aiding and abetting liability under section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. § 78a et seq.), because the language of the statute does not create such liability. (*Central Bank of Denver v. First Interstate Bank of Denver* (1994) 511 U.S. 164, 177-178.) The court rejected a policy argument in favor of imposing aider and abettor liability, noting that the rules for determining aiding and abetting liability were unclear and that decisions were

12

being made on an " 'ad hoc' " basis. (*Id.* at p. 188.) In an analysis that preceded the Supreme Court's 1994 decision, one commentator characterized the "majority" view of the elements of a cause of action for aiding and abetting a federal securities law violation as follows: "(1) the existence of a securities law violation by the primary (as opposed to the aiding and abetting) party; [¶] (2) 'knowledge' of this violation on the part of the aider and abettor; and [¶] (3) 'substantial assistance' by the aider and abettor in the achievement of the primary violation." (Bromberg & Lowenfels, *Aiding and Abetting Securities Fraud: A Critical Examination* (1988) 52 Albany L.Rev. 637, 662; see *K & S Partnership v. Continental Bank, N.A.* (8th Cir. 1991) 952 F.2d 971, 977.)

The body of case law predating the abolition of liability for aiding and abetting a federal securities law violation provides little insight here because it turns on definitions of aiding and abetting that are markedly different from the statutory elements of an action under section 25504.1. Among other things, the requirement under section 25504.1 that a person materially assist in the securities law violation is narrower in scope than a requirement that a person substantially assist in the achievement of the violation. Assisting in a violation is not the same as assisting someone achieve a violation, which can presumably be accomplished without having any involvement in the violation itself. Although liability under section 25504.1 may be referred to colloquially as aiding and abetting liability, we are not free to apply definitions of aiding and abetting derived from common law or other sources. We are bound to interpret and apply the language of the statute.

Plaintiffs place particular emphasis on the decision of a federal trial court in *In re Rexplore Inc. Securities Litigation* (N.D. Cal. 1988) 685 F.Supp. 1132 (*Rexplore*), which predates the 1994 decision of the United States Supreme Court in which it abolished aiding and abetting liability for a federal securities law violation. The reliance on *Rexplore* is misplaced. There, the court applied a three-part test to assess whether the complaint adequately stated a cause of action for aiding and abetting a federal securities law violation. (*Id.* at p. 1135.) Because the analysis turned on a definition of aiding and

13

abetting that is different from the statutory elements under section 25504.1, the discussion of aiding and abetting liability is inapposite.

Further, to the extent the decision in *Rexplore* discusses section 25504.1, it is consistent with our analysis. Plaintiffs characterize the *Rexplore* decision as holding that a complaint against a bank adequately alleged material assistance under section 25504.1 based on the bank's funding of limited partnerships that were sold to investors. That characterization is correct insofar as it relates to liability under federal rule 10b-5 (17 C.F.R. § 240.10b-5). In the discussion of aiding and abetting liability, which we have pointed out is not based on the language of section 25504.1, the court applied a "but for" analysis and concluded the "substantial assistance" prong of aiding and abetting liability under federal Rule 10b-5 was satisfied because there could have been no fraud without the bank's funding of the limited partnerships. (*Rexplore, supra,* 685 F.Supp. at p. 1136.) However, in assessing liability under section 25504.1, the court relied on its analysis under section 12(2) of the Securities Act of 1933 (15 U.S.C. § 77L et seq.), which is the statute on which section 25504.1 is modeled. (See *Viterbi v. Wasserman* (2011) 191 Cal.App.4th 927, 937.) In its discussion of the section 12(2) violation, the court noted that plaintiffs alleged the bank participated in the review, drafting, and approval of the offering materials provided to investors that purportedly contained misrepresentations and omissions. (*Rexplore,* at p. 1137.) Thus, consistent with our interpretation of the material assistance requirement of section 25504.1, the plaintiffs alleged the bank materially assisted in the securities law violation itself. It was the bank's "participation in the sale of the unregistered securities" that allowed the complaint to survive a motion to dismiss the claim under section 25504.1. (*Rexplore,* at p. 1139.)

Plaintiffs also contend their position is supported by *In re First Alliance Mortgage Co.* (9th Cir. 2006) 471 F.3d 977. We disagree. The case does not involve a section 25504.1 claim but instead considers a cause of action for aiding and abetting common law fraud. (471 F.3d at pp. 992-995.) For the reasons we have discussed, our analysis turns on the language of section 25504.1 and not on the common law definition of aiding and abetting.

14

Likewise, plaintiffs are mistaken in relying on *Forslund v. Rein* (C.D. Cal. 2003) 2003 U.S. District Lexis 16832, an unpublished decision of the federal district court. As plaintiffs interpret the federal court's ruling on a motion for summary judgment, a lawyer that reviewed and revised documents setting up a company that ran a Ponzi scheme was potentially liable under section 25504.1, even though the lawyer and his firm did not make any misrepresentations to investors or conspire to do so. However, plaintiffs' characterization of the lawyer's role is incomplete. The court found the plaintiff had produced evidence raising a triable issue as to whether the lawyer had made direct misrepresentations to the victims of the fraud. One victim emphasized the lawyer's "personal involvement" in the scheme and stated he was induced to invest based on the lawyer's claim that he personally reviewed and revised the documents. (*Forslund v. Rein, supra,* at p. *5.) Thus, it was not enough that the lawyer provided assistance making it possible for the primary violator to carry out its Ponzi scheme. Summary judgment was denied because there was a triable issue as to whether the lawyer materially assisted in the securities law violation itself.

Here, the underlying securities violation involved two key misrepresentations or material omissions of fact in the PPM distributed to plaintiffs. The complaint does not support a claim that Morgan Keegan materially assisted in the alleged securities law violation. There are no allegations that Morgan Keegan had any involvement in selling or offering to sell TIC's by false and misleading statements in the PPM or any other documents relied upon by plaintiffs. In fact, Morgan Keegan is not alleged to have had any communications whatsoever with plaintiffs, let alone to have made false or misleading statements to them. Nor is Morgan Keegan alleged to have played any role in the preparation, drafting, or distribution of the PPM. At most, plaintiffs allege Morgan Keegan prepared an offering memorandum directed at lenders AREI sought as joint venture partners. However, plaintiffs do not allege they relied on the offering memorandum prepared by Morgan Keegan or were even aware of its existence. In short, there are no allegations that Morgan Keegan provided material assistance in some aspect of the alleged violation of section 25401.

15

Plaintiffs' cause of action against Morgan Keegan under section 25504.1 fails at the threshold because the allegations of the complaint do not support a claim that Morgan Keegan materially assisted in a violation of section 25401. Therefore, it is unnecessary to consider the scienter component of the statute and decide whether plaintiffs adequately alleged that Morgan Keegan acted with an intent to deceive or defraud.

### c.    *Privity*

As a separate basis for affirming the trial court's decision, Morgan Keegan argues that a cause of action for rescission under section 25504.1 is not viable without an allegation that there was privity of contract between plaintiffs and Morgan Keegan. Morgan Keegan raises the issue for the first time on appeal in reliance on a decision published after the trial court issued its decision. (See *Viterbi v. Wasserman, supra,* 191 Cal.App.4th 927.) In *Viterbi,* the court held that rescission is unavailable as a remedy under section 25504.1 unless there was privity of contract between the person holding the security and the defendant. (191 Cal.App.4th at pp. 941-943.) As plaintiffs point out, another Court of Appeal came to the opposition conclusion in *Moss v. Kroner, supra,* 197 Cal.App.4th 860.

We need not weigh in on whether section 25504.1 requires a showing of privity to support a rescission remedy. Our conclusion that plaintiffs have failed to allege that Morgan Keegan materially assisted in a violation of section 25401 is sufficient to dispose of the cause of action under section 25504.1. Perhaps more importantly, our resolution of the issue would ultimately have no bearing on the case below in light of circumstances plaintiffs have brought to our attention. Plaintiffs point out that, since the complaint was filed, they have been dispossessed of their TIC interests after defendant Meecorp foreclosed on the Roseville property. Although plaintiffs sought rescission when they still held their TIC interests, they would now be entitled to amend their complaint to seek damages. (See § 25501 [providing for rescission but allowing recovery of damages if the plaintiff no longer owns the security].) Because there is no need to establish privity to pursue a damages claim, it would serve no purpose for this court to take a position on whether section 25504.1 requires a showing of privity to support a rescission remedy.

16

**d.** *Leave to Amend*

The remaining question is whether the trial court abused its discretion in denying plaintiffs leave to amend their complaint. As explained in *Rakestraw v. California Physicians' Service* (2000) 81 Cal.App.4th 39, 44, "The burden of showing that a reasonable possibility exists that amendment can cure the defects remains with the plaintiff; neither the trial court nor this court will rewrite a complaint. [Citation.] Where the appellant offers no allegations to support the possibility of amendment and no legal authority showing the viability of new causes of action, there is no basis for finding the trial court abused its discretion when it sustained the demurrer without leave to amend."

In the proceeding before the trial court, plaintiffs did not offer any new allegations supporting the possibility of amendment or any legal authority establishing the viability of new causes of action. They complain that they were not allowed to take discovery before the demurrer was sustained and ask to pursue discovery to develop specific facts that may support amendments to the complaint. However, a vague suggestion that additional facts might be uncovered through discovery is insufficient to justify allowing plaintiffs further leave to amend their complaint. (*Rice v. Center Point, Inc.* (2007) 154 Cal.App.4th 949, 959.) The trial court already granted plaintiffs one opportunity to amend their complaint after a demurrer was sustained. In the absence of a showing by plaintiffs that they were capable of curing the defects in the complaint after a demurrer was sustained a second time, the trial court acted well within its discretion in denying further leave to amend as to the cause of action under section 25504.1.

At oral argument on appeal, counsel for plaintiffs claimed he now has in his possession a document describing the scope of Morgan Keegan's involvement in the transaction. Counsel argued that this document supports an allegation that Morgan Keegan assisted in the preparation of the PPM or otherwise materially assisted in the statutory securities violation. Counsel urged this court to allow plaintiffs an opportunity to amend their complaint as a matter of equity in light of the representations made at oral argument. We decline to do so.

17

It is a fundamental rule of appellate procedure that our review is limited to the record before the trial court at the time it made the challenged ruling. (*Reserve Insurance Co. v. Pisciotta* (1982) 30 Cal.3d 800, 813; accord *Vons Companies, Inc. v. Seabest Foods, Inc.* (1996) 14 Cal.4th 434, 444, fn. 3.) Although there are narrow exceptions to this general rule that may permit consideration of extra-record evidence in limited circumstances (see, e.g., Code Civ. Proc., § 909), no such circumstances exist here. (See *Vons Companies, Inc., supra,* at p. 444, fn. 3.) Further, "it would be eminently unfair to assess a trial court's exercise of discretion based on matters not before it at the time of decision." (*Reese v. Wal-Mart Stores, Inc.* (1999) 73 Cal.App.4th 1225, 1237.)

For purposes of this appeal, we disregard counsel's belated representations about a newly discovered document, which is not properly part of the record before us. While we are not in a position as a reviewing court to grant plaintiffs leave to amend as a matter of right, nothing prevents plaintiffs on remand from asking the trial court to allow them to amend their complaint in order to replead the cause of action under section 25504.1 based upon newly discovered evidence of Morgan Keegan's involvement in the securities law violation. It is up to the trial court in the first instance to assess whether such an amendment is permitted following this appeal and whether any newly pleaded allegations allow plaintiffs to adequately state a cause of action under section 25504.1. We express no opinion regarding the proper resolution of those issues.

### 3. Fraud and Conspiracy

The trial court sustained the demurrer to the cause of action for fraud, reasoning that plaintiffs had failed to plead specific facts showing either an *agreement* between Morgan Keegan and AREI to defraud plaintiffs, or Morgan Keegan's *knowledge* of the fraud. For the reasons that follow, we conclude the complaint adequately states a cause of action against Morgan Keegan for fraud based upon its role in a purported conspiracy to defraud.

"Conspiracy is not a cause of action, but a legal doctrine that imposes liability on persons who, although not actually committing a tort themselves, share with the immediate tortfeasors a common plan or design in its perpetration." (*Applied Equipment*

18

*Corp. v. Litton Saudi Arabia Ltd.* (1994) 7 Cal.4th 503, 510-511.) A civil conspiracy "must be activated by the commission of an actual tort." (*Id.* at p. 511.)

In this case, the underlying tort is common law fraud. The elements of common law fraud are: "(1) a misrepresentation (false representation, concealment, or nondisclosure); (2) knowledge of falsity (or scienter); (3) intent to defraud, i.e., to induce reliance; (4) justifiable reliance; and (5) resulting damage." (*Robinson Helicopter Co. v. Dana Corp.* (2004) 34 Cal.4th 979, 990.)

Morgan Keegan does not dispute that the complaint adequately states a cause of action for fraud against AREI. Instead, Morgan Keegan argues that the conspiracy allegations are insufficient to establish that it should bear liability for the actions of AREI. To support a conspiracy claim, a plaintiff must allege the following elements: "(1) the formation and operation of the conspiracy, (2) wrongful conduct in furtherance of the conspiracy, and (3) damages arising from the wrongful conduct." (*Kidron v. Movie Acquisition Corp.* (1995) 40 Cal.App.4th 1571, 1581; see also *Applied Equipment Corp. v. Litton Saudi Arabia Ltd., supra,* 7 Cal.4th at p. 511.)

It is well settled that " '[b]are' allegations and 'rank' conjecture do not suffice for civil conspiracy." (*Choate v. County of Orange* (2000) 86 Cal.App.4th 312, 333.) A party seeking to establish a civil conspiracy "must show that each member of the conspiracy acted in concert and came to a mutual understanding to accomplish a common and unlawful plan, and that one or more of them committed an overt act to further it. [Citation.] It is not enough that the [conspirators] knew of an intended wrongful act, they must agree—expressly or tacitly—to achieve it." (*Ibid.*) It must be recognized, however, that because of the very nature of a conspiracy, "its existence must often be inferentially and circumstantially derived from the character of the acts done, the relations of the parties and other facts and circumstances suggestive of concerted action." (*Schessler v. Keck* (1954) 125 Cal.App.2d 827, 833.) While a complaint must contain more than a bare allegation the defendants conspired, a complaint is sufficient if it apprises the defendant of the "character and type of facts and circumstances upon which she was relying to establish the conspiracy." (*Ibid.*; see also *Bradley v. Hartford Acc. & Indem.*

19

*Co.* (1973) 30 Cal.App.3d 818, 825, disapproved on other grounds in *Silberg v. Anderson* (1990) 50 Cal.3d 205, 217.)

Morgan Keegan argues that plaintiffs have not pleaded specific facts establishing that it knew of AREI's scheme to defraud. We disagree. While we are mindful that bare allegations are insufficient to establish a defendant's knowledge, the complaint does more than simply state that Morgan Keegan was aware of AREI's plan to defraud plaintiffs. Plaintiffs have pleaded facts and circumstances that permit a reasonable inference Morgan Keegan was aware of the plan to defraud, at least as to the plan to conceal Koenig's background as a convicted felon. These facts and circumstances include Morgan Keegan's close involvement over a period of several months with AREI to develop a master deal, allowing Morgan Keegan to gain detailed insider knowledge about AREI's operations and information about Koenig's background. Morgan Keegan also took primary responsibility for drafting an offering memorandum that included subsections about the background of AREI's officers, including Koenig, and it acted as a go-between for AREI and prospective lenders for background checks on Koenig and the potential viability of AREI's projects. In light of Morgan Keegan's extensive role in the transaction and involvement with background checks, it is reasonable to infer that it was in a position to know of Koenig's criminal background.

Further, the complaint alleges that Morgan Keegan reviewed PPM's for several of AREI's senior living facilities, thus informing it that AREI intended to defraud investors by omitting mention of Koenig's prior conviction in offering materials distributed to potential investors. It is irrelevant that Morgan Keegan may not have specifically seen the PPM for the Roseville property. As a consequence of reviewing other PPM's that were part of the overall plan to market senior living facilities, Morgan Keegan would have been aware of AREI's overall plan to conceal Koenig's background from potential investors. These allegations are sufficient to establish that Morgan Keegan knew of the plan to conceal Koenig's criminal background from potential investors, including plaintiffs.

20

The factual support is not as clear for the allegation that Morgan Keegan knew of the plan to conceal the existence of the $5.1 million mezzanine loan from plaintiffs. While it is certainly the case that Morgan Keegan knew of the mezzanine loan, which it is alleged to have structured, there is no specific allegation explaining how Morgan Keegan would have known of the supposed failure to disclose the loan's existence to plaintiffs. Instead, plaintiffs offer a bare allegation that Morgan Keegan "knew the loan was not disclosed" to plaintiffs. That is insufficient. The PPM specified that the investors in the Roseville property could approve additional loans secured by the property. Absent an allegation that Morgan Keegan knew the mezzanine loan was not unanimously approved by plaintiffs, the additional, mezzanine loan was a valid and authorized transaction as far as Morgan Keegan was concerned. Further, although plaintiffs make much of the overleveraging of the Roseville property with the mezzanine loan, the property was already overleveraged in view of the fact plaintiffs' investment of over $17 million together with the CapSource loan of $7 million exceeded the purchase price of $18.8 million. Consequently, the mere fact the Meecorp loan further leveraged the property would not have signaled to Morgan Keegan that the loan was necessarily unauthorized or concealed from investors. Accordingly, the complaint does not include sufficiently specific allegations supporting the claim that Morgan Keegan knew of the alleged scheme to conceal the existence of the mezzanine loan.

Morgan Keegan also argues there is insufficient factual support for the allegation it had an agreement with AREI to defraud plaintiffs. Again, we disagree. An agreement may be tacit as well as express. (*Choate v. County of Orange, supra,* 86 Cal.App.4th at p. 333.) A conspirator's concurrence in the scheme " ' " 'may be inferred from the nature of the acts done, the relation of the parties, the interests of the alleged conspirators, and other circumstances.' " ' " (*Wyatt v. Union Mortgage Co.* (1979) 24 Cal.3d 773, 785.) In this case, Morgan Keegan's agreement to participate in the scheme is evidenced by allegations that it structured the overall transaction for AREI with knowledge that AREI intended to conceal the existence of Koenig's criminal background from investors. Morgan Keegan's role was instrumental in furthering the scheme. Its tacit agreement to

21

defraud plaintiffs can be inferred from its willingness to further a scheme that it purportedly knew would rely on material misrepresentations and omissions. For its alleged role in the scheme, Morgan Keegan sought to be paid over $500,000. Therefore, Morgan Keegan did not just allegedly have knowledge of the scheme and acquiesce in its commission, but it also played a key role for which it was compensated.

Morgan Keegan's position is that it did nothing more than play a legitimate role in a lawful transaction to arrange for debt financing. However, for purposes of imposing liability under a conspiracy theory, it is not necessary to allege that Morgan Keegan made any misrepresentations to plaintiffs or played an active role in the sales of TIC interests. If plaintiffs could show that Morgan Keegan itself made false representations, there would be no need to include conspiracy allegations. (See 5 Witkin, Cal. Procedure (5th ed. 2008) Pleading, § 921, p. 336.) The purpose of conspiracy allegations is to establish a conspirator's liability as a joint tortfeasor "regardless of whether [the conspirator] was a direct participant in the wrongful act." (*Ibid.*)

Moreover, even if Morgan Keegan's role, when viewed in isolation, was part of a legitimate business transaction, it cannot be viewed as such when the scheme is viewed as a whole. No legitimate purpose was served by structuring a transaction hinging upon the concealment of the felony conviction of the founder and sole owner of the business venture. In addition, plaintiffs alleged that Morgan Keegan failed to disclose Koenig's conviction in offering materials directed to lenders, including CapSource. Thus, Morgan Keegan did not just provide ordinary business services to AREI with knowledge that its efforts would further the scheme to defraud. It also allegedly participated in efforts to conceal Koenig's conviction. Although CapSource allegedly learned of Koenig's background before agreeing to provide financing, the fact remains that Morgan Keegan purportedly attempted to conceal the prior conviction in materials it prepared. This allegation further supports the conclusion that Morgan Keegan did not just provide ordinary business services but actively agreed to participate in the conspiracy.

We conclude that the allegations of the complaint, if accepted as true, are sufficient to support a cause of action for fraud against Morgan Keegan based upon a

conspiracy theory, at least as to the contention that Morgan Keegan conspired with AREI in a scheme to conceal Koenig's felony conviction from investors.

## DISPOSITION

The judgment is reversed. The trial court is directed to enter a new and different order (1) sustaining the demurrer without leave to amend as to the third cause of action for materially assisting in a securities violation, and (2) overruling the demurrer as to the tenth cause of action for fraud premised on the existence of a conspiracy. The parties shall bear their own costs on appeal.


_____
McGuiness, P. J.

We concur:


_____
Pollak, J.


_____
Siggins, J.

23

Superior Court of Marin County, No. JCCP 4730, Verna Adams, Judge.

Counsel for Plaintiffs and Appellants:      CAPPELLO & NOËL LLP, A. Barry Cappello, Troy A. Thielemann, Matthew H. Fisher

Counsel for Defendants and Respondents:      WINSTON & STRAWN LLP, Neal R. Marder, Nicole L. Herft